Estate of Ira F. Searle, The First Trust Company of Lincoln, Nebraska, Executor v. Commissioner. Estate of I. G. Chapin, Barbara D. Chapin and I. S. Chapin, Executors v. Commissioner.
Estate of Ira F. Searle v. Commissioner
Docket Nos. 24804, 24805.
United States Tax Court
1950 Tax Ct. Memo LEXIS 59; 9 T.C.M. (CCH) 957; T.C.M. (RIA) 50261; October 31, 1950
Frank D. Williams, Esq., First Nat. Bank Bldg., Lincoln, Neb., for the petitioners. George E. Gibson, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: In these proceedings, which were consolidated for hearing, respondent determined deficiencies in income tax and penalty for the calendar year 1943 as follows: Docket
No.
Petitioner
Deficiency
Penalty
24804
Estate of Ira F. Searle
$25,800.53
24805
Estate of I. G. Chapin
21,096.86
$5,274.22
The only issue common to both proceedings is whether amounts received by each of the petitioners from transfers of stock belonging individually to them in the Searle & Chapin Lumber Co. were proceeds from the sale of such stock, *60 as the transfers purported to be, or whether, as the respondent determined, same represented redemption of the stock at such time and in such manner as to be essentially equivalent to the distribution of a taxable dividend within the meaning of section 115(g), Internal Revenue Code. Applicable only to Docket No. 24805 is whether the failure of the executors in Chapin's estate to file an income tax return for the period April 15 to December 31, 1943, required the imposition of a 25 per cent penalty under section 291(a) of the Code, as respondent determined. Findings of Fact We adopt the stipulation of facts, and from it and oral testimony find: Ira F. Searle (hereinafter called Searle) and I. G. Chapin (also known as Irving G. Chapin) were individuals residing in Omaha, Nebraska. Searle, on October 25, 1943, was adjudged incompetent by the County Court of Lancaster County, Nebraska (hereinafter called County Court) and Lucy Mary Searle, his wife, and The First Trust Company of Lincoln, Nebraska (hereinafter called the Trust Company) were appointed guardians of his estate and continued to serve as such until the death of Lucy Mary Searle in 1944, and *61 thereafter the Trust Company served as guardian of his estate until Searle's death on October 14, 1946, [1] when the court appointed the Trust Company as executor of his estate, which has since continued to serve as such. Searle's income tax return for the year 1943 was filed with the collector of internal revenue for the district of Nebraska. I. G. Chapin died April 15, 1943, [2] and the County Court appointed I. S. Chapin, his son, and Barbara D. Chapin, his wife, executors of his estate, who have continued to serve as such. No tax return for his estate was filed for the period ended December 31, 1943, the executors having been advised by their attorneys and also by a certified public accountant, upon which advice they relied, that the estate had no income for 1943 and hence they were not required to file a return. The failure to file such return was due to reasonable cause and not due to willful neglect. Searle & Chapin Lumber Co. (hereinafter called the Company), was incorporated September 28, 1899, under Nebraska law, with its principal office in Lincoln, Nebraska, and an authorized *62 capital of $100,000. Its business was the sale of coal, lumber and building supplies from its yard in Lincoln and yards in various towns in Nebraska and Kansas. Its books were kept on an accrual basis, its fiscal year ending November 30th. Upon its organization 1,000 shares of common stock of the par value of $100 each were issued. No change in its capital stock of $100,000 has been made, except its charter was amended in January 1948 so as to authorize the issuance of 5,000 shares of the par value of $100 each. No stock dividend was ever declared by the Company. The stockholders of record and the number of shares in the name of each from the date of organization to December 15, 1943, were as follows: Sept. 28,
June 3,
July 31,
Dec. 28,
Apr. 15,
Dec. 15,
1899
1914
1917
1935
1943
1943
I. F. Searle
499
1
201
201
201
0
I. G. Chapin
499
499
499
400
400
0
E. B. Chapin **
1
1
1
* 100
100
100
L. M. Searle **
1
499
299
299
299
280
I. G. Chapin Estate
0
0
0
0
0
180
Searle & Chapin Lumber
Co.
0
0
0
0
0
440
*63 From organization of the Company, I. G. Chapin was its president until his death April 15, 1943, and I. F. Searle was its secretary and treasurer until he resigned on August 27, 1943. These officers were the active managers of the Company and the books were kept under their direction. On August 27, 1943, I. S. Chapin, the son of I. G. Chapin, was elected president of the Company, and has held that position continuously since. Over a period of years the withdrawals of I. F. Searle and his wife, Lucy Mary Searle, and of I. G. Chapin, in excess of credits for salaries, dividends and other items, left balances in their respective personal accounts on the books of the Company, at the end of its fiscal years as follows: L. M. Searle
I. F. Searle
(Mrs. I. F.)
I. G. Chapin
Nov. 30
Dr.
Cr.
Dr.
Cr.
Dr.
1912
$ 1,906.62
$11,620.16
$ 7,324.70
1913
$12,766.53
21,191.41
13,385.15
1914
18,649.80
*
21,520.24
1915
0
*
27,331.22
1916
*
*
*
*
1917
*
*
9,364.15
*
1918
0
*
17,064.83
21,083.63
1919
0
22,474.22
11,668.63
1920
0
30,334.99
19,076.51
1921
12,500.00
15,034.59
29,680.64
1922
0
43,318.04
44,471.23
1923
0
58,630.01
59,713.30
1924
0
$ 3,076.98
68,961.93
1925
0
10,238.64
74,204.36
1926
0
33,458.01
74,141.43
1927
0
28,120.67
82,351.78
1928
0
40,792.90
77,068.85
1929
22,289.14
47,570.07
73,693.57
1930
37,148.15
47,795.29
75,661.61
1931
56,360.63
29,656.53
73,483.50
1932
68,736.44
14,335.03
75,003.16
1933
71,281.96
9,343.94
80,610.65
1934
74,040.38
2,641.42
83,844.59
1935
82,704.43
1,112.00
88,617.66
1936
89,525.55
0
747.44
90,095.54
1937
89,005.73
422.28
89,892.09
1938
90,748.47
1.07
90,441.32
1939
91,345.69
0
102.18
88,956.01
1940
89,159.94
0
70.34
88,956.31
1941
89,122.62
2.13
87,328.45
1942
88,071.16
3,160.28
89,220.85
11/27 1943
94,608.64
750.67
94,098.16
*64 A summary of the surplus account, showing the net profits, dividends paid, and surplus balances by years from 1912 to 1945, inclusive, is as follows: SUMMARY OF SURPLUS ACCOUNT, PER BOOKS November 30, 1912, to November 30, 1945 Dividends
Surplus
Paid
Misc.
Credits
P/L
Balance
1912
$300,677.31
1913
$20,000.00
$10,567.90
291,245.21 **
1914
5,269.39
296,514.60
1915
28,228.16
324,742.76
1916
40,000.00
39,826.42
324,569.18
1917
20,000.00
59,035.40
363,604.58
1918
20,000.00
11,049.54
354,654.12
1919
40,000.00
78,687.38
393,341.50
1920
40,000.00
40,272.65
393,614.15
1921
20,000.00
* 23,029.80
350,584.35
1922
10,000.00
18,258.55
358,842.90
1923
10,000.00
15,904.15
364,747.05
1924
10,000.00
24,544.36
379,291.41
1925
10,000.00
42,746.99
412,038.40
1926
15,000.00
3,066.48
400,104.88
1927
15,000.00
21,777.51
406,882.39
1928
20,000.00
35,411.87
422,294.26
1929
10,000.00
19,549.44
431,843.70
1930
* 10,280.68
421,563.02
1931
30,000.00
* 12,547.82
379,015.20
1932
30,000.00
* 16,989.81
332,025.39
1933
7,803.84
339,829.23
1934
10,000.00
17.05
329,846.28
1935
934.21
330,780.49
1936
4,243.10
335,023.59
1937
$43.43
228.06
335,295.08
1938
18,000.00
116.50
317,411.58
1939
530.98
317,942.56
1940
3,744.87
321,687.43
1941
15,670.23
337,357.66
1942
31,357.85
368,715.51
1943
6,175.19
374,890.70
1944
16,495.31
391,386.01
1945
22,002.52
413,388.53
$388,000.00
*65 NOTE: Net profit per books does not necessarily agree with taxable net profit each year. Following are balance sheets of Searle & Chapin Lumber Co., as shown by its books on the dates indicated: ASSETS
1940
1941
1942
1943
1944
Cash
$ 7,931.21
$ 7,514.88
$ 58,129.33
$ 89,122.39
$ 65,209.15
U.S. Bonds
23,000.00
Notes and Accounts
Receivable
I. F. Searle
89,159.94
89,122.62
88,071.16
94,608.64
I. G. Chapin
88,956.31
87,328.45
89,220.85
94,098.16
L. M. Searle
* 70.34
2.13
3,160.28
* 750.67
Others
70,882.52
82,164.99
72,288.57
65,470.17
87,796.70
Inventories
198,420.24
228,213.66
148,828.55
150,916.08
183,157.19
Deferred Charges
Fixed assets less
depreciation
57,303.44
59,693.66
54,293.09
54,282.85
45,236.34
Treasury Stock
(Cost)
177,650.00
$512,583.32
$554,040.39
$513,991.83
$547,747.62
$582,049.38
LIABILITIES AND
NET WORTH
Notes Payable
$ 54,300.00
$ 75,510.00
$ 1,060.90
Accounts Payable
31,549.70
35,996.22
38,237.27
$ 48,089.15
$ 62,351.42
Accrued Charges
5,046.19
5,176.51
5,978.15
24,767.77
28,311.95
Capital Stock
100,000.00
100,000.00
100,000.00
100,000.00
100,000.00
Surplus
321,687.43
337,357.66
368,715.51
374,890.70
391,386.01
$512,583.32
$554,040.39
$513,991.83
$547,747.62
$582,049.38
*66 On December 14, 1943, the amount of the earnings or profits of the Company accumulated from February 28, 1913, was $81,275.86. By order of the County Court the time limited for presentation and filing of claims against the Chapin estate was November 1, 1943, and for payment of debts, June 1, 1944. On October 30, 1943, Searle & Chapin Lumber Co. filed with the County Court a claim against the Estate of I. G. Chapin in the amount of $94,098.16, asserting a lien on all of the stock in the Company owned by the decedent. Other claims filed against the estate amounted to $5,431.75. In Chapin's estate, on December 10, 1943, an order was entered by the County Court approving the claim of Searle & Chapin Lumber Co. against the estate in the sum of $94,098.16 for money loaned and advanced to him by the Company; and furthermore that the claim is secured by lien on decedent's stock in the Company. The gross value of the Chapin estate, as determined by the County Court, was $168,410, which included the 400 shares of his stock in the Company at $403.75 a share, or $161,500. In 1942, when the indebtedness of Searle was $93,686.96, Mrs. Searle assigned to her husband, *67 to be used by him as collateral, Certificate No. 18 for 99 shares of stock in the Company. In turn, Searle delivered this certificate to the president as additional security for his indebtedness to the Company. At a stockholders' meeting held November 27, 1943, the following resolution was adopted: "WHEREAS, I. G. Chapin, former president, died on April 15th, 1943, and I. F. Searle, former Secretary-Treasurer, was adjudged incompetent on the 25th day of October, 1943, and proceedings are pending in the County Court of Lancaster County, Nebraska, upon the estates of each of said two former officers, and "WHEREAS, each of said former officers was indebted to this company for money loaned and advanced over a period of years, for which indebtedness the estates of said two former officers are liable and it is necessary and essential that the accounts and indebtedness of said officers and their estates be liquidated and it appearing that the assets of the said [estates] consists mostly of stock in this company; upon which stock it has a lien for any indebtedness due to it, and "WHEREAS, Lucy M. Searle, the wife of I. F. Searle, is also the owner of stock, which was heretofore assigned *68 to the company as collateral security for the indebtedness of I. F. Searle, and; "WHEREAS, it appears that it will be necessary for the estates of I. G. Chapin and I. F. Searle and for said Lucy M. Searle to sell part of their stock to raise the funds to pay the indebtedness to this Company; now therefore; "BE IT RESOLVED; That President Irving S. Chapin is authorized and directed to negotiate with the legal representative of the estates of I. G. Chapin and I. F. Searle and with Lucy M. Searle towards the liquidation and collection of the indebtedness of the said former officers and for said purpose the president is authorized to purchase in behalf of the company, to be held as treasury stock, 220 shares of stock from the estate of I. G. Chapin, Deceased and 220 shares of stock from Lucy M. Searle and the estate of I. F. Searle, Incompetent, being a total of 440 shares at a price of $403.75 per share, on condition that the purchase money will be applied in liquidation and payment of the indebtedness of said two estates as of December 1, 1942, being then as follows: I. G. Chapin, $89,220.85; I. F. Searle, $88,071.16; and as there is an additional indebtedness of I. G. Chapin in *69 the amount of $4,877.31 and I. F. Searle in the amount of $6,537.48 for money advanced and loaned to said former officers after December 1, 1942, the president is authorized and directed to negotiate with the legal representatives of their estates towards the liquidation and collection of said additional indebtedness." Executors of the Chapin estate filed, on December 10, 1943, in the County Court petition for leave to sell 220 shares of stock in the Company at a price of $403.75 to satisfy an indebtedness due by the Chapin estate to the Company, it reciting that the court had already approved the claim of the Company for that amount. And on the same date the County Court approved the petition, authorizing the sale of such stock to the Company at that price by decree of that date. On December 13, 1943, the Company borrowed from The First National Bank of Lincoln the sum of $110,000, which was credited on the books of the bank, making the Company's balance $201,043.18. Against its balance in said bank the Company, on December 14, 1943, issued its check to the executors of the Estate of I. G. Chapin, in the sum of $88,825, on delivery to the Company of 220 shares of stock. This check *70 was cleared by the bank on December 14, 1943. On December 14, 1943, against the aforesaid balance, the Company issued its checks to the guardians of the Estate of I. F. Searle, Incompetent, in the sum of $81,153.75, plus $6,917.41, and a check to Lucy M. Searle for $753.84, on delivery to the Company of 201 shares of stock owned by Ira F. Searle, and 19 shares out of Certificate No. 18, referred to above. These checks were cleared by the bank on December 15, 1943. On December 14, 1943, the executors of the Estate of I. G. Chapin issued and delivered to the Company their check in the sum of $89,220.85, which check was endorsed and deposited by the Company to its credit, and was cleared by the bank on December 14, 1943. On the same date the Company also received from E. B. Chapin a check in the amount of $4,877.31. On December 14, 1943, the following entries were made to the credit of the account of I. G. Chapin on the books of the company: Cr.
1943
$ 4,877.31
Ck. from E. B. Chapin
Dec. 14
89,220.85
Ck. from Executors of I. G.
Chapin Estate
Dec. 14
$94,098.16
On December 14, 1943, the guardians of the Estate of I. F. Searle issued and delivered *71 to the Company their checks in the sum of $88,071.16 and $6,553.48, which checks were endorsed and deposited by the Company to its credit and cleared by the bank on December 15, 1943. On December 14, 1943, and January 7, 1944, the following entries were made to the credit of the account of I. F. Searle on the books of the Company: Cr.
1943
$ 6,533.48
Ck. from Guardians of I. F.
Searle
Dec. 14
88,071.16
Ck. from Guardians of I. F.
Searle
Dec. 14
1944
4.00
Cash
Jan. 7
$94,608.64
The transfer in 1943 to Searle & Chapin Lumber Co. of 440 shares of its capital stock at $403.75 per share, viz: 201 shares owned by petitioner Estate of Ira F. Searle, 19 shares owned by Lucy M. Searle, and 220 shares owned by petitioner Estate of I. G. Chapin, to satisfy $88,825, respectively, of the indebtednesses owed the Company by each petitioner, was a sale of stock to the Company and was not made under such facts and circumstances as to make the transaction "essentially equivalent to the distribution of a taxable dividend" under section 115(g), Internal Revenue Code. Opinion Did respondent err in determining that the transactions *72 in December 1943, by which Searle & Chapin Lumber Co. acquired certain shares of its own capital stock, viz: 201 shares owned by Estate of Ira F. Searle, incompetent, 19 shares owned by Lucy M. Searle, and 220 shares owned by Estate of I. G. Chapin, deceased, were not sales as they purported to be, but were in fact a redemption of the stock at such time and in such manner as to be essentially equivalent to the distribution of taxable dividends under section 115(g)[3] of the Code? With this determination we can not agree. The record as a whole shows the contrary to be true. As applied to the facts here *73 some provisions of the Commissioner's own regulations, [4] interpreting section 115(g), tend to refute rather than sustain him. Here (1) it can not be said that the transactions were a redemption of a portion of its stock "pro rata among all of the shareholders", one of the characteristics of a dividend and one of the tests mentioned in the regulation; and here (2) there was a sale of "all of the stock of a particular shareholder", i.e., Estate of I. F. Searle, Incompetent, and under the express terms of the regulation the transaction as to this stock "does not effect a distribution of *74 a taxable dividend." Respondent asserts that the fact that the redemption was not pro rata among all the shareholders would not take it out of the class of distributions essentially equivalent to dividends under section 115(g), and cites J. Natwick, 36 B.T.A. 866. While the absence of a pro rata distribution may not of itself exclude a transaction from the purview of section 115(g), yet since the Commissioner affirmatively provides that such a distribution "will generally be considered" sufficient to bring the transaction within the purview of the section, its absence would certainly be a circumstance, and we think here a cogent one, when considered with other facts of the case, in determining the section's inapplicability. In the Natwick case, supra, the taxpayer when the corporation was created, owned all of the stock except two shares, one each being owned by qualifying stockholders, gifts of the taxpayer, and it was said that the corporation was under the absolute domination and control of the taxpayer and he was "to all intents and purposes the sole stockholder." The facts here accentuate the lack of a pro rata redemption among all of the shareholders. At the *75 time of the three transactions in question there were four individual shareholders, each owning a substantial number of shares. E. B. Chapin, owning 100 shares, sold none and hence received nothing and retained all of her stock after the transaction; the Estate of I. G. Chapin owned 400 shares and sold 220, retaining 180 shares; Lucy M. Searle owned 299 shares and sold 19, retaining 280 shares, while the Estate of Ira F. Searle owned 201 shares, all of which were sold and hence "ceased to be interested in the affairs of the corporation." The amount received by each of the three sellers or transferors of the stock was at the rate of $403.75 per share. There is no merit in respondent's contention that because prior to the transactions in question the members of the Searle family owned 500 shares and those of the Chapin family owned 500 shares, and thereafter members of each family owned 280 shares, and hence, there being no change in the proportional ownership of the two families, "from a realistic and practical rather than a technical standpoint" there was a pro rata distribution. The ownership of stock in a corporation vests in the individual who owns it, not the family to which *76 he belongs. The regulation relates to "the stock of a particular shareholder", not that of a family. Besides, the question here is not what effect the transactions had as to the proportionate ownership of the stock, but rather whether the proceeds from the transactions were distributed pro rata among all of the shareholders. Neither do we agree with respondent that the 19 shares sold as the stock of Lucy M. Searle belonged to her husband's (I. F. Searle) estate. The evidence shows without dispute, and the County Court likewise decreed, that on August 24, 1942, Lucy M. Searle at the request of the Company assigned 99 shares of her stock to be used as collateral in securing the indebtedness of her husband to the Company and that her assignment "was not in any maner a gift thereof." Only 19 of the 99 shares were sold, that being sufficient, when supplemented by the 201 shares belonging to her husband, to liquidate his indebtedness to the Company. Carlton B. Overton, 6 T.C. 304; affd., 162 Fed. (2d) 155, cited by respondent is not in point. Under the facts there, which are materially different from those here, it was held that the husband's assignment of the *77 stock to his wife was a gift. Respondent cites Flanagan v. Helvering, 116 Fed. (2d) 937. There are essential differences in the two cases, among them being that in the Flanagan case, as result of the transactions, "the proportional ownership of the shareholders was not changed" [italics supplied] and there also only two cash dividends had been paid during the 15 years of the corporation's existence. Here, while dividends had not been paid for five years, yet from 1913 to 1943, inclusive, net earnings of the Company were $462,169.96, and during that period 19 annual dividends were paid, aggregating $388,000. Petitioner relies strongly on R. W. Creech, 46 B.T.A. 93. We agree that the essential facts there are very much like those in the instant case. However, we deem it unnecessary to compare the facts here with that and other cases cited. Section 115(g) has been considered in a multitude of decisions by this and other courts, and in one respect they all agree, as the regulation prescribes, that the question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend *78 depends upon the circumstances of each case. The facts here clearly reveal that the transactions in question were bona fide sales made for the purpose of liquidating the indebtedness due the Company by two of its principal stockholders, one of whom had died and the other had become mentally incompetent, both occurring during the taxable year. Both the intention and the net effect of the transactions was to liquidate such indebtedness and not to make a distribution of dividends. In view of what had happened to the two stockholders in 1943, it was natural that the Company and likewise the estates of the two stockholders and the courts administering same should all want a settlement and termination of the indebtedness out of the stock in the Company of which these stockholders' assets largely consisted. The sales of the stock were made by the County Court after inquiring into all of the facts and for a fair and reasonable price as found by the court, and only enough stock was sold to satisfy the indebtedness. The transactions were natural and normal under all the circumstances and clearly refute respondent's determination that same was done to effect the distribution of a dividend. *79 Respondent's action in invoking section 115(g) is reversed. As to the penalty issue in Docket No. 24805, the Estate of I. G. Chapin having no income tax for 1943 as a result of our holding on the first issue herein, therefore no penalty can be assessed under section 291(a), Internal Revenue Code. Decisions will be entered for petitioners. Footnotes
1. Searle was then in his late seventies.↩
2. I. G. Chapin's age at death was 83 years.↩
**. E. B. Chapin (also known as Barbara D. Chapin) was the wife of I. G. Chapin, and L. M. Searle (also known as Lucy Mary Searle) was the wife of I. F. Searle.↩
*. The 99 shares were transferred December 28, 1935, to E. B. Chapin as a gift from her husband, I. G. Chapin. ↩
*. Ledger sheets not located. The amounts of withdrawals in excess of salaries and dividends were not reported by I. G. Chapin or I. F. Searle in their respective individual income tax returns and no Federal income taxes were ever paid thereon.↩
**. Surplus March 1, 1913, as adjusted by Revenue Agent's report dated June 12, 1947 - $317,699.39.↩
*. Indicates loss. ↩
*. Credit balance.↩
3. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. * * *
(g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩
4. Regulations 111 SEC. 29.115-9. * * * * * * A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. * * *↩